FILED
CLERK, U.S. DISTRICT COURT

DEC - 1 2014

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

1  MATTHEW C. MICKELSON (S.B.N. 203867)
2  LAW OFFICES OF MATTHEW C. MICKELSON
   16055 Ventura Boulevard, Ste. 1230
3  Encino, CA 91436
   T: 818-382-3360  F:818-382-3364
4  mattmickelson@bizla.rr.com

5  Attorneys for Plaintiff THE RECEIVABLES EXCHANGE, LLC.

6

7              UNITED STATES DISTRICT COURT

8              CENTRAL DISTRICT OF CALIFORNIA

9
   THE RECEIVABLES EXHANGE, LLC,        Case No.
10 a Louisiana limited liability company   CV14-09219 DSF (FFMx)

11         Plaintiff,                    COMPLAINT FOR
                                         1. BREACH OF CONTRACT
12 vs.                                   2. OPEN BOOK ACCOUNT
                                         3. ACCOUNT STATED
13 TRMUSICGROUP,  Nevada corporation;    4. FRAUD
   TEDDY RILEY, an individual; LAURA     5. NEGLIGENT REPRESENTATION
14 RILEY, an individual; STORM           6. CONSPIRACY TO COMMIT
   DUBOIS, an individual; and DOES 1     FRAUD
15 through 10, inclusive.

16         Defendants

17

18

19

20

21

22

23

24

25

26

27

28



RECEIVED
CLERK, U.S. DISTRICT COURT

NOV 2 4 2014

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

Plaintiff alleges:

1.      Jurisdiction.  The jurisdiction of the court over the subject matter of this action is predicated on 28 U.S.C. § 1332.  The Plaintiff is a citizen of Louisiana.  The Defendants are citizens of California and Nevada.   The amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Plaintiff THE RECEIVABLES EXCHANGE, LLC is, and at all times herein mentioned was, a limited liability company organized and existing under the laws of Louisiana with its principal place of business at 11 Wall Street, 15th Floor New York, NY 10005.

3.      Defendant TRMUSICGROUP (hereinafter "TR Music") is, and at all times herein mentioned was, a corporation organized and existing under the laws of Nevada with its principal place of business at 1317 N. San Fernando Boulevard, Burbank California 91504.

4.      Defendant TEDDY RILEY is, and at all times herein mentioned was, a resident of the State of California with his residence in Los Angeles County, California.

5.      Defendant LAURA RILEY is, and at all times herein mentioned was, a resident of the State of California with her residence in Los Angeles County, California.

6.      Defendant STORM DUBOIS is, and at all times herein mentioned was, a resident of the State of Nevada with his residence in Clark County, Nevada.  As a co-

conspirator with the other defendants, this Court has personal jurisdiction over Storm DuBois (*see Textor v. Board of Regents of No. Ill. Univ.* (7th Cir. 1983) 711 F.2d 1387, 1392.)

7.     Plaintiff is informed and believes and thereon declares that each of the Defendants, including those herein named as DOES, are the agents, servants and employees of each of the other Defendants, and in doing the things herein alleged, each acted within the course and scope of said agency and employment and with the full knowledge and consent of each of the remaining Defendants.

8.     Venue.  Venue is proper in the Central District of California because a substantial part of the events or omissions giving rise to the claim occurred in this District.

9.     Plaintiff is informed and believes and thereon declares that each of the Defendants, are the agents, servants and employees of each of the other Defendants, and in doing the things herein alleged, each acted within the course and scope of said agency and employment and with the full knowledge and consent of each of the remaining Defendants.

10.     Plaintiff is a receivables exchange business.

11.     Plaintiff has established an electronic marketplace over which qualified sellers may offer Eligible Receivables for sale to Plaintiff's member buyers.

12.     Sales are concluded after Plaintiff conducts an electronic auction over the Exchange, wherein an eligible receivable is sold to a member buyer at the highest

price.

13. Upon conclusion of the sale, the buyer is the owner of the receivable and is legally empowered and entitled to collect the debt in its own name.

14. Upon conclusion of the sale, if the receivable is not paid by the payment date Plaintiff retains the right to sue on the receivables in its own capacity and as an administrative agent and collateral agent of the buyer.

15. Advanced Technology Services, Inc. d/b/a Optidoc ("ATS") is a Georgia corporation, with its domicile or principal place of business in Marietta, Georgia.

16. ATS agreed to Plaintiff's terms and conditions in order to become a registered seller of eligible Receivables on the Exchange.

17. ATS sold to buyers on Plaintiff's exchange certain Receivables owed to it by Defendant TR Music.

18. Before ATS posted any Receivables for auction over the Exchange, ATS agreed to instruct, and did in fact instruct, in writing, the account debtor, TR Music, on each invoice to remit payment to Plaintiff.

FIRST CAUSE OF ACTION

AGAINST DEFENDANT TRMUSICGROUP

BREACH OF CONTRACT

19. Plaintiff realleges Paragraphs 1 through 18, inclusive and by reference thereto, incorporates the same as though fully set forth herein.

20. On July 18, 2013 ATS entered into a Customer Agreement with

Defendant TR Music granting the right to purchase materials and licenses. A true and correct copy of the Customer Agreement is attached hereto as Exhibit "A."

21.    ATS represented to Plaintiff that Defendant TR Music ordered materials and licenses from ATS and that ATS provided such materials and licenses to Defendant TR Music. A true and correct copy of the invoice for the sale is attached hereto as Exhibit "B."

22.    Defendant TR Music represented to Plaintiff that it promised to pay for the materials and licenses purportedly provided by ATS.

23.    ATS assigned its right to receive payment for the materials and licenses over to Plaintiff's receivables marketplace. A true and correct copy of the Auction Summary is attached hereto as Exhibit "C."

24.    Pursuant to the terms of the receivables marketplace Plaintiff maintains a continuing security interest in the accounts and retains the right to sue on the receivables in its own capacity and as an administrative agent and collateral agent of the buyer.

25.    There is an outstanding balance of $326,480, plus interest on the receivables owed to ATS, and then transferred to Plaintiff and its buyers after the auction sale on Plaintiff's exchange.

26.    The balance has been due and owing since September 17, 2013.

27.    Within four years last past, Defendant TR Music has breached the terms of the Customer Agreement by failing to pay for the materials and licenses provided

1    by ATS.

2    28.    Plaintiff and ATS have complied and have performed all conditions,

3    covenants and promises required of it in accordance with the terms and conditions of

4    the Customer Agreement, and Plaintiff is entitled to the receipt of payment from

5    Defendant TR Music in the sum of $326,480, plus interest at the legal rate from

6    September 17, 2013 until paid in full.  In addition, Section 9.2 of the ATS-TR Music

7    Customer Agreement provided that attorney's fees would be granted to ATS for fees

8    incurred "as a result of any claim arising from [TR Music's] activity."  Because the

9    Customer Agreement was assigned to Plaintiff in the auction, Plaintiff is entitled to

10   attorney's fees from TR Music.

### SECOND CAUSE OF ACTION

### AGAINST DEFENDANT TRMUSICGROUP

### OPEN BOOK ACCOUNT

29.    Plaintiff re-alleges paragraphs 1 through 28, inclusive, and by reference

thereto, incorporates the same as though fully set forth herein.

30.    Within four years last past, TR Music became indebted to ATS on an

open book account for materials and licenses purchased on behalf of Defendants, and

each of them in the amount of $326,480.  ATS assigned its right to receive payment

for the materials and licenses over Plaintiff's receivables marketplace.  (See Exhibit

"C.")  Pursuant to the terms of the receivables marketplace Plaintiff maintains a

continuing security interest in the accounts and retains the right to sue on the

receivables in its own capacity and as an administrative agent and collateral agent of the buyer.

31. Neither the whole nor any part of said sum has been paid, although demand therefore has been made, and there is now due, owing and unpaid from the Defendants, and each of them, to Plaintiff, the sum of $326,480 plus interest at the legal rate from September 17, 2013 until paid in full.

THIRD CAUSE OF ACTION

AGAINST TRMUSICGROUP

ACCOUNT STATED

32. Plaintiff re-alleges paragraphs 1 through 31 inclusive of the Complaint, and by reference thereto, incorporates the same as though fully set forth herein.

33. Within four years last past, an account was stated in writing by and between Defendant TR Music and ATS, wherein it was agreed that TR Music was indebted to ATS in the sum of $326,480 for materials and licenses purchased at the special instance and request of TR Music, and/or for its use and benefit, and said materials and licenses were delivered. ATS assigned its right to receive payment for the materials and licenses over Plaintiff's receivables marketplace. (See Exhibit "C.") Pursuant to the terms of the receivables marketplace Plaintiff maintains a continuing security interest in the accounts and retains the right to sue on the receivables in its own capacity and as an administrative agent and collateral agent of the buyer.

34. Neither the whole nor any part of said sum has been paid, although

demand therefore has been made, and there is now due, owing and unpaid from the Defendant to Plaintiff, the sum of $326,480 plus interest at the legal rate from September 17, 2013 until paid in full.

## FOURTH CAUSE OF ACTION

## AGAINST TRMUSICGROUP AND LAURA RILEY

## FRAUD

35. Plaintiff re-alleges paragraphs 1 through 34, inclusive, and by reference thereto, incorporates the same as though fully set forth herein.

36. As discussed above, Plaintiff has established an electronic marketplace over which qualified sellers may offer Eligible Receivables for sale to Plaintiff's member buyers. In July, 2013, ATS put itself forward as a seller on Plaintiffs electronic marketplace. ATS's President, Maureen Mitchell, represented to Plaintiff that it had valid and legitimate accounts receivables that it wished to sell on Plaintiff's marketplace.

37. As part of Plaintiff's procedures for verifying that accounts receivables are valid, Plaintiff required that any seller of accounts receivable on its exchange, in this particular case ATS, send to the account debtor, in this case TR Music, a notice that all payments for the particular account receivable sold be made to a new account controlled by Plaintiff. Such a notice was sent from ATS to TR Music in late July, 2013. Defendant Laura Riley as CFO of TR Music sent back to ATS a written and signed acknowledgment of the change of accounts for payment on July 18, 2013. In

addition, on July 25, 2013, an employee at Plaintiff called TR Music and requested oral confirmation that the notice had been received and that payment would be made to the new address. Laura Riley informed the employee that the notice had been received and that payment would be made.

38. Plaintiff alleges that at all times when TR Music and Laura Riley stated that it knew about the new payment account and that payment on the ATS-TR Music invoice would be made, that they knew that these assertions were false, and that in fact no materials or licenses were transferred between ATS and TR Music, and that ATS, TR Music, Laura Riley, Teddy Riley and Storm DuBois instead were involved in a fraudulent conspiracy to create fake accounts receivables to sell on Plaintiffs exchange, which by design would never be paid by the account debtor TR Music, in order to fraudulently induce the payment of money from purchasers on the exchange, which would then be spread amongst the conspirators after being received by the seller. Buyers on the exchange have contractually assigned to Plaintiff all their rights to collect sums from defaulting account debtors such as TR Music, and accordingly Plaintiff possesses standing to sue for the fraudulent representations made to it.

39. The misrepresentations described in this cause of action were made by TR Music and Laura Riley to Plaintiff. The misrepresentations were made indirectly on July 18, 2013 to ATS, a member of the heretofore mentioned conspiracy, when Laura Riley transmitted her acknowledgment of change of account

to ATS, which then relayed that to Plaintiff. In addition, the misrepresentations that TR Music acknowledged the change of account for payment and that payment would be made were made directly from Laura Riley to an employee of Plaintiff, Chris Forcum, on July 25, 2013.

40. Plaintiff did not discover, and by diligent inquiry could not have discovered, the facts that TR Music and Laura Riley's statements were false until September 17, 2013, when TR Music failed to pay the money due under its contract with ATS .

41. The suppression of the above-described fact that TR Music never intended to pay any money under the ATS-TR Music agreement, was likely to mislead Plaintiff and did in fact did mislead it.

42. The representations and failures to disclose information and suppressions of information by TR Music and Laura Riley were made with the intent to induce Plaintiff to list ATS's fraudulent accounts receivable on the exchange and secure a buyer to purchase those accounts receivable in order to receive cash to distribute to the members of the conspiracy.

43. Plaintiff, at the times these suppressions of information occurred, was ignorant of the existence of the facts which TR Music and Laura Riley suppressed and failed to disclose. If Plaintiff had been aware of the existence of the facts not disclosed by TR Music and Laura Riley, it would not have listed ATS's accounts receivable for sale on its exchange.

44.     As a proximate result of TR Music and Laura Riley's fraud and deceit and the facts herein alleged, Plaintiff has been damaged in the amount of at least $326,480, consisting of the monies paid by buyers on the exchange for the fraudulent accounts receivable, who have assigned their rights to payment to Plaintiff.

45.     The aforementioned acts of TR Music and Laura Riley were intentional misrepresentations, deceit and/or concealment of material facts known to TR Music and Laura Riley with the intention on the part of TR Music and Laura Riley of thereby depriving the buyers on the exchange and Plaintiff of property, money, or otherwise causing injury,  and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious  disregard of its rights so as to justify an award of exemplary and punitive damages

### FIFTH CAUSE OF ACTION

### AGAINST TRMUSICGROUP AND LAURA RILEY

### NEGLIGENT MISREPRESENTATION

46.     Cross-complainants re-allege paragraphs 1 through 45, inclusive, and by reference thereto, incorporates the same as though fully set forth herein.

47.     As discussed above, Plaintiff has established an electronic marketplace over which qualified sellers may offer Eligible Receivables for sale to Plaintiff's member buyers.  In July, 2013, ATS put itself forward as a seller on Plaintiffs electronic marketplace, its President, Maureen Mitchell, represented to Plaintiffs that it had valid and legitimate accounts receivables that it wished to sell on Plaintiff's

marketplace.

48. As part of Plaintiff's procedures for verifying that accounts receivables are valid, Plaintiff required that any seller of accounts receivable on its exchange, in this particular case ATS, send to the account debtor, in this case TR Music, a notice that all payments for the particular account receivable sold be made to a new account controlled by Plaintiff. Such a notice was sent from ATS to TR Music in late July, 2013. Defendant Laura Riley as CFO of TR Music sent back to ATS a written and signed acknowledgment of the change of accounts for payment on July 18, 2013. In addition, on July 25, 2013, an employee at Plaintiff called TR Music and requested oral confirmation that the notice had been received and that payment would be made to the new address. Laura Riley informed the employee that the notice had been received and that payment would be made.

49. Plaintiff alleges that at all times when TR Music and Laura Riley stated that they knew about the new payment account and that payment on the ATS-TR Music invoice would be made, that they had no reasonable ground for believing these statements to be true, in that no reasonable person would state that payment would be made on an invoice when no materials or licenses had ever been delivered to TR Music from ATS. Buyers on the exchange have contractually assigned to Plaintiff all their rights to collect sums from defaulting account debtors such as TR Music, and accordingly Plaintiff possesses standing to sue for the fraudulent representations made to it.

50.   The misrepresentations described in this cause of action were made by TR Music and Laura Riley to Plaintiff. The misrepresentations were made indirectly on July 18, 2013 to ATS, a member of the heretofore mentioned conspiracy, when Laura Riley transmitted her acknowledgment of change of account to ATS, which then relayed that to Plaintiff. In addition, the misrepresentations that TR Music acknowledged the change of account for payment and that payment would be made were made directly from Laura Riley to an employee of Plaintiff, Chris Forcum, on July 25, 2013.

51.   Plaintiff did not discover, and by diligent inquiry could not have discovered, the facts that TR Music and Laura Riley's statements were false until September 17, 2013, when TR Music failed to pay the money due under its contract with ATS .

52.   The suppression of the above-described fact that TR Music never intended to pay any money under the ATS-TR Music agreement, was likely to mislead Plaintiff and did in fact did mislead it.

53.   The representations and failures to disclose information and suppressions of information by TR Music and Laura Riley were made with the intent to induce Plaintiff to list ATS's fraudulent accounts receivable on the exchange and secure a buyer to purchase those accounts receivable in order to receive cash to distribute to the members of the conspiracy.

54.   Plaintiff, at the times these suppressions of information occurred, was

ignorant of the existence of the facts which TR Music and Laura Riley suppressed and failed to disclose. If Plaintiff had been aware of the existence of the facts not disclosed by TR Music and Laura Riley, it would not have listed ATS's accounts receivable for sale on its exchange.

55.     As a proximate result of TR Music and Laura Riley's fraud and deceit and the facts herein alleged, Plaintiff has been damaged in the amount of at least $326,480, consisting of the monies paid by buyers on the exchange for the fraudulent accounts receivable, who have assigned their rights to payment to Plaintiff.

## SIXTH CAUSE OF ACTION

## AGAINST TRMUSICGROUP, LAURA RILEY, TEDDY RILEY, AND STORM DUBOIS

## CONSPIRACY TO COMMIT FRAUD

56.     Plaintiff re-alleges paragraphs 1 through 55, inclusive, and by reference thereto, incorporates the same as though fully set forth herein.

57.     As alleged above, between May and July 2013, ATS, TR Music and Laura Riley agreed and knowingly and willfully conspired between themselves to defraud Plaintiff and the buyers on Plaintiff's exchange by providing phony accounts receivable, which would then be purchased by buyers, and the funds from that purchase would be distributed among the conspirators.

58.     Under this conspiracy, Storm DuBois, TR Music, Laura Riley, Teddy Riley (the owner of TR Music) and ATS worked to "package" the fraudulent accounts

receivable to Plaintiff in a way that would make such accounts receivable appear legitimate and valid, by making the fraudulent representations described above. Once Plaintiff and the buyers on the exchange were duped by the phony accounts receivable, and money was paid, then ATS would distribute the monies in an agreed-upon fashion to Storm DuBois and to TR Music. Here, the money received by ATS from the buyers participating in Plaintiff's exchange was wired into ATS's account on August 6, 2013. On August 7, 2013, pursuant to the conspiracy between the parties, ATS wired $12,500 to Storm DuBois, through his corporation SNH, Inc., and wired $250,000 to TR Music.

59.     Defendants did the acts and things herein alleged pursuant to, and in furtherance of, the conspiracy and agreement alleged above.

60.     Buyers on the exchange have contractually assigned to Plaintiff all their rights to collect sums from defaulting account debtors such as TR Music, and accordingly Plaintiff possesses standing to sue for the damages to the buyers caused by the conspiracy alleged herein. As a proximate result of the wrongful acts herein alleged, Plaintiff has been damaged in a sum to be determined at trial, but which is no smaller than $326,480.

61.     The aforementioned acts of Defendants, as described above, were done with the intention on the part of Defendants of depriving Plaintiff and the exchange buyers of property, money, or otherwise causing injury and was despicable conduct that subjected Plaintiff to a cruel and unjust hardship in conscious  disregard of their

1   rights so as to justify an award of exemplary and punitive damages.

2       WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of

3   them, as follows:

### FOR THE FIRST CAUSE OF ACTION AGAINST TR MUSIC:

1.     For general damages in an amount to be determined at trial, but not less than $326,480;

2.     For interest thereon at the legal rate and according to proof from September 17, 2013;

3.     For reasonable attorney's fees pursuant to the contract;

### FOR THE SECOND CAUSE OF ACTION AGAINST TR MUSIC:

1.     For general damages in an amount to be determined at trial, but not less than $326,480;

2.     For interest thereon at the legal rate and according to proof from September 17, 2013;

3.     For attorney's fees pursuant to California Civil Code Section 1717.5;

### FOR THE THIRD CAUSE OF ACTION AGAINST TR MUSIC:

1.     For general damages in an amount to be determined at trial, but not less than $326,480;

2.     For interest thereon at the legal rate and according to proof from September 17, 2013;

FOR THE FOURTH CAUSE OF ACTION AGAINST TR MUSIC AND LAURA RILEY:

1.   For general damages in an amount to be determined at trial, but not less than $326,480;

2.   For interest thereon at the legal rate and according to proof from September 17, 2013;

3.   For punitive and exemplary damages according to proof;

FOR THE FIFTH CAUSE OF ACTION AGAINST TR MUSIC AND LAURA RILEY:

1.   For general damages in an amount to be determined at trial, but not less than $326,480;

2.   For interest thereon at the legal rate and according to proof from September 17, 2013;

FOR THE SIXTH CAUSE OF ACTION AGAINST TR MUSIC, LAURA RILEY, TEDDY RILEY AND STORM DUBOIS:

1.   For general damages in an amount to be determined at trial, but not less than $326,480;

2.   For interest thereon at the legal rate and according to proof from September 17, 2013;

3.   For punitive and exemplary damages according to proof;

FOR ALL CAUSES OF ACTION:

1.    For costs of suit incurred herein;

2.    For reasonable attorneys' fees; and

3.    For such other and further relief as this Court may deem just and

proper.

DATED:  November 21, 2014          LAW OFFICES OF
                                   MATTHEW C. MICKELSON


By:_____
     MATTHEW C. MICKELSON
     Attorney for Plaintiff THE RECEIVABLES
     EXCHANGE, LLC

# OPTIDOC CUSTOMER AGREEMENT

1. **INTRODUCTION**

   This Agreement is made and entered into this __18th____ day of __July_____, 2013 by and between Advanced Technology Services, Inc. (hereinafter referred to as "ATS"), 2000 Powers Ferry Road SE, Suite 535, Marietta, GA 30067, USA and the following company, person, or entity (hereinafter referred to as "Customer"):

   Customer Business Name: _ TR Music Group_____
   Customer Primary Contact: _ Laura Riley or Edward Riley_____
   Customer Business Address: 1317 N. San Fernando Blvd.___
   Customer City, St. Zip   Burbank, CA 91504_____
   Customer Telephone 770-884-1975_____

2. **DEFINITIONS**

   As used in this Agreement, the following definitions shall apply:

   2.1   "Agreement" shall mean this Agreement between ATS and Customer.

   2.2   "Confidential Information" shall mean any information relating to or disclosed in the course of this Agreement, which is or should be reasonably understood to be confidential or proprietary to the disclosing party. "Confidential Information" shall not include information (a) already lawfully known to the receiving party, (b) disclosed in published materials, (c) generally known to the public, or (d) lawfully obtained from any third party.

   2.3   "Customer(s)" shall mean persons or entities that license Software from ATS for their own business, Commercial or personal use, but not for re-marketing, time-sharing or service bureau use.

   2.4   "Software License Agreement" shall mean a License Agreement between ATS and a customer relating to the licensing of the Software and is attached as Schedule C.

   2.5   "Software License Fee Schedule" shall mean ATS's list of available Software and retail fees for the license of such products to Customers. Such list is subject to change without notice. A copy of ATS's current Software License Fee Schedule, relating to the Software, current as of the effective date, is attached as Schedule A.

   2.6   "Software Maintenance Agreement" shall mean a written Agreement between ATS and the Customer relating to extending the period for Licensor to provide Software maintenance and limited warranty coverage for the Software, as further detailed in the attached Schedule B.

   2.7   "Unlimited Telephone Support" shall be the amounts payable from Customer to ATS in consideration for extended Primary Support services pursuant to an executed Software Maintenance Agreement. A copy of the current Software Maintenance Fee Schedule is attached to this Agreement as Schedule D.

   2.8   "Upgrade or Enhancement" shall mean newer releases of the Software as developed and commercially released by ATS.

3. **GRANT OF LICENSE**

   3.1   During the term of this Agreement, ATS designates the Partner as a non-exclusive Partner for the Software under the terms and conditions of this Agreement. This right is non-transferable and applies solely to the distribution and licensing of the Software in unaltered, object code version form to Customers. Nothing under the terms and conditions of this Agreement, including any of the attachments and Schedules, grant any right to Partner to the use of, or access to, any Software source code. This grant does not include any right to otherwise utilize the Software or information relating to it or any right to reproduce the Software or to make and/or sell variations or derivative works of the Software. Sole ownership of copyrights and other intellectual and proprietary rights to the Software shall remain solely with ATS. Partner shall not be permitted to use the Software for the processing of data for third parties, for the operation of a service bureau, or for any other use other than internal use and for the promotional and marketing purposes authorized herein.

   3.2   Customer accepts the grant, in the limited scope provided herein, and agrees to use its best efforts to

communicate the features, benefits, and pricing and availability of the Software to Customers Users.

3.3 All parties acknowledge that any expenditures or commitments are made at the risk of the party making such expenditures or commitments. Partner agrees that it shall be responsible for its own expenses and costs under this Agreement and that ATS shall have no obligation to reimburse Partner for any expenses or costs incurred by Partner in the performance of Partner's duties hereunder.

## 4. USE OF COPYRIGHTS AND TRADEMARKS.

ATS grants to Customer a non-exclusive right and license to use its trademark (OptiDoc®) for purpose of (1) in signs and stationary of Partner indicating its status as an authorized Customer, (2) in such marketing materials as ATS may choose to supply to Customer, and (3) in such advertising and other uses as ATS may authorize in writing. Customer may not use the trademarks in connection with any goods other than those of OptiDoc®.

## 5. TITLE TO SOFTWARE:

5.1 Subject to the rights granted to Customer herein, all rights, title and interest in and to the Software, at all times, shall remain the sole and exclusive property of ATS. No right to use, print, copy, display, or alter the Software, in whole or in part, is hereby granted, except as expressly provided in this Agreement. No ownership right is granted to any intellectual property relating to the Software. No right is granted to Customer to use, distribute, rent, lease, lend, supply, or market Software, except as expressly provided in this Agreement, Customer may not disassemble, extract any source code from, or reverse engineer the Software.

## 6. SOFTWARE ORDERS, LICENSE FEES, AND PAYMENT

Customer shall submit written purchase orders for Software to ATS. All purchase orders submitted to ATS by Customer shall be subject solely to the terms of this Agreement, and any preprinted terms on any purchase order form used for the convenience of Customer shall not alter or amend the terms of this Agreement. ATS shall determine credit terms based upon credit worthiness.

## 7. ATS'S OPTION TO MODIFY OR DISCONTINUE SOFTWARE

7.1 ATS has the right, at any time, to make such modifications to the Software as it sees fit to the operation, performance, or functionality of the Software, or discontinue distribution of older versions of software as it sees fit.

## 8. WARRANTY

8.1 ATS represents and warrants to Customer that is has the necessary rights to enter into this Agreement and that it has the necessary ownership and intellectual property rights to the Software to grant the licenses herein. ATS warrants that the Software will operate generally in conformance with its published documentation, if properly used by Customer. If any errors are discovered, Customer shall promptly notify ATS in writing as to the description of the problem, whereupon ATS shall use reasonable efforts to correct such problems within a reasonable time thereafter. Corrections will be provided to Customer with instructions for implementation. The remedies set forth in this Agreement shall be Customer's sole remedies for breach of this Agreement.

8.2 THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTY OF MERCHANTABILITY ANT) FITNESS FOR A PARTICULAR PURPOSE. THE RIGHTS AND REMEDIES GRANTED TO PARTNER UNDER THIS PARAGRAPH CONSTITUTE THE SOLE ANT) EXCLUSIVE REMEDY OF AND PARTNER'S CUSTOMERS AGAINST ATS FOR BREACH OF WARRANTY, EXPRESS OR IMPLIED, OR FOR ANY ERRORS OR DEFECTS IN THE SOFTWARE. IN NO EVENT SHALL ATS BE LIABLE TO PARTNER OR PARTNER'S CUSTOMERS FOR ANY DAMAGES ARISING FROM OR RELATED TO FAILURE OR INTERRUPTION OF THE SOFTWARE, OR FOR INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, OR FOR LOSS OF PROFIT OR OPPORTUNITY, LOSS OF USE OR OTHER FINANCIAL LOSS ARISING OUT OF OR IN CONNECTION WITH THE LICENSE, TRANSFER OR USE OF THE SOFTWARE. IN NO EVENT SHALL ATS'S LIABILITY HEREUNDER EXCEED THE TOTAL AMOUNT RECEIVED BY ATS UNDER THIS AGREEMENT.

**9        INDEMNIFICATION**

9.1      ATS agrees to indemnify Customer against all liability and expense, including reasonable attorney fees, arising from any breach or alleged breach of ATS' s warranty that it has the required rights to the Software and that the Software does not infringe any ownership or intellectual property right of a third party, provided that ATS: (i)      is notified immediately after Customer receives notice of such claim (ii) is solely in charge of the defense of and any settlement negotiations with respect to such claim; (iii) received Customer's cooperation in the defense or settlement of such claim; (iv) has the right, upon either the occurrence of or the likelihood (in the opinion of ATS) of the occurrence of a finding of infringement, either to procure for Customer the right to continue use of the Software, or to replace the relevant portions of the Software with other equivalent, non-infringing portions. If ATS is unable to accomplish either of the options set forth in (iv) above, at ATS's option ATS shall either remove the portion of the Software in issue and refund to Partner the value of such portion, or remove the entire Software and refund to Customer the entire amount paid under this Agreement as it relates to the incident that gave rise to the claim. IN NO EVENT SHALL ATS's LIABILITY HEREUNDER EXCEED THE TOTAL AMOUNT PAID TO ATS BY CUSTOMER. ATS shall have no obligation to Customer to defend or satisfy any claims made against Customer that arise from use, marketing, licensing, or disposition of the Software by Customer other than as permitted by this Agreement.

9.2      Customer agrees to indemnify ATS against all liability and expense, including reasonable attorney fees, arising from or out of any breach or alleged breach of Partner's representation, warranties, and obligations or as a result of any claim arising from Customer's activity.

**10.     TERM AND TERMINATION**

10.1     This Agreement shall take effect on the Effective Date. Unless sooner terminated in accordance with the  relevant provisions of this Agreement, the term of this Agreement shall be for one (1) year and shall be automatically renewed successively for an additional term of one (1) year unless either party, in its sole discretion, gives notice of termination no less than sixty (60) days prior to the expiration of then current term.

10.2     Upon termination of this Agreement, and except as otherwise provided in this Agreement, the license granted to Partner by this Agreement shall be terminated immediately; Customer shall make no further use of all or any part of the Software or any confidential information received from ATS.

10.3     In the event of termination, ATS shall be entitled to, but shall not be obligated to, deal with any Customers who have licensed the Software. Software License Agreements and other contracts or Agreements relating to the Software specified by ATS; and Customer shall cooperate fully with ATS and perform all acts appropriate to carry out the provisions of this Agreement relating to termination.

**11.     GENERAL PROVISIONS**

11.1     Assignment. ATS may assign this Agreement. This Agreement may not be assigned by Partner, nor any duty hereunder be delegated by Partner without the prior written consent of ATS. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, legal representatives, successors and permitted assigns.

11.2     Taxes. Excise, sales, use, privilege, personal property, gross receipts and similar taxes levied or imposed by reason of the transactions under this Agreement. Customer shall, upon demand, pay to ATS an amount equal to any such tax actually paid or collected by ATS.

11.3     Governing Law. This Agreement shall be governed and interpreted in accordance with the substantive law of the State of Georgia, United States of America.

11.4     Entire Agreement. This Agreement constitutes the entire Agreement and understanding of the parties and supersedes all prior and contemporaneous Agreements, understandings, negotiations, and proposals, oral or written. Section headings are provided for convenience purposes only and do not provide any modifications or substantive meaning to the terms and conditions of this Agreement. This Agreement may be amended or modified only by a subsequent Agreement in writing signed by each of the parties and may not be modified by course of conduct.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized representatives:

Accepted and Agreed:

Customer: TR Music Group

By:

Name: Laura Riley

Title: CFO

Date: 7-18-2013

Advanced Technology Services, Inc.

By: Maureen Mitchell

Name: Maureen Mitchell

Title: President

Date: 7/19/2013

## List of Schedules

Schedule A – Software License Fee Schedule

Schedule B – Annual Software Maintenance and Update Agreement

Schedule C – Software License Agreement

Schedule D – Customer Telephone Support Agreement

## Schedule A – Software License Fee Schedule

**OptiDoc**

Licensee may install OptiDoc Software in two (2) network servers / PC's in conjunction with OptiDoc document management software to provide access to stored documents via the Internet's World Wide Web on a two (2) Internet domains. Each Server License allows the 350 specified web users to be connected at any given time.

## OptiDoc Enterprise System $326,480.00

| | |
|---|---|
| 2 | Enterprise Content Servers |
| 1 | Administration/Security Module |
| 350 | Web Document Retrieval users |
| 2 | Lockbox Gateway Modules |

## OptiDoc Software Maintenance

Included in Pricing

## OptiDoc Unlimited Telephone Support

Included in Pricing

## OptiDoc Professional Services

Consulting, Design, Installation and Training Services

Included in Pricing

**Schedule C**                **OptiDoc SOFTWARE LICENSE AGREEMENT**

## APPENDIX A: Software Products Covered by the Annual Software Maintenance Agreement

| OptiDoc IDM Software Products | Quantity | Annual Software Maintenance Fee |
|---|---|---|
| OptiDoc webIT retrieval users | 350 | Included in Pricing |
| OptiDoc Lockbox Gateways | 2 | Included in Pricing |
| OptiDoc Server Connection License | 2 | Included in Pricing |
| **Annual Software Maintenance** | | |

**Schedule D**            **TELEPHONE SUPPORT AGREEMENT**

## IMPORTANT- READ CAREFULLY

This Software License Agreement is a legal agreement made and entered into between Advanced Technology Services, Inc., ("Licensor"), a Georgia Corporation and the Licensee named below. Licensor is the owner of the OptiDoc Integrated Document Management System and is licensing the Software and related computer programs, technical specifications, user documentation and training materials, including but not limited to those products described in the attached OptiDoc IDM Product and Services Agreement and referred to in this Agreement as ("Software"), upon the terms and conditions contained in this Agreement. By installing, copying, or otherwise using the Software, Licensee agrees to be bound by the terms of this Software License Agreement. In consideration for the foregoing covenants, and agreements contained herein, the parties hereto agree as follows:

1. **LICENSE:**
   a) Licensor grants to Licensee, and Licensee accepts, a perpetual, non-exclusive, non-assignable, non-transferable, license to the Software listed in the accompanying Schedule B of the OptiDoc IDM Product and Services Agreement in machine-readable code on a single network server. This license allows Software to be used for the processing of data in the ordinary course of the business of the Licensee. Licensee shall not be permitted to utilize the software for the processing of data for others entities as a service bureau. Licensee may not remove any proprietary notices or labels on or in the Software. Licensee may not sell, transfer, rent, lease or otherwise sub-license the Software or documentation to any third party under any circumstances. Licensee may not in any way modify the Software. Any modifications to the Software will negate and void the limited warranties expressed herein. Licensee shall not create modifications or adaptations to the Software or documentation in whole or in part including but not limited to translating or creating derivative works; furthermore, Licensee shall not be permitted to disassemble or reverse compile the Software for any reason whatsoever.
   b) The license(s) for the Software shall pass to Licensee upon payment to Licensor of the license fee in full. Licensee assumes all risk of loss, damage or destruction of Software after acceptance by Licensee. Loss, damage or destruction to Software shall not relieve Licensee of its obligation to make any payments specified herein. The Software License(s) are NON-TRANSFERABLE and NON-ASSIGNABLE except as provided in Sec. 5.05 of the OptiDoc IDM Product and Services Agreement.

2. **OWNERSHIP**: Licensee acknowledges and agrees that Licensor maintains exclusive ownership of and to Software, in all forms and all copies thereof including, without limitation, any and all worldwide copyrights, patents, trade secrets, trademarks, and proprietary and confidential information rights associated with Software. The Software is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. The Software is licensed, not sold. Licensee shall not reverse engineer, disassemble or recompile the Software, in whole or in part, or prepare derivative works of Software or any portion thereof. No ownership rights in any of Software are transferred to Licensee. Licensee acknowledges and warrants that nothing in this agreement gives it the right, title or interest in Software except for Licensee's limited express rights granted pursuant to Section 1 of this Software License Agreement.

3. **NON-ASSIGNMENT**: Neither this Agreement nor any of the Licensee's obligations hereunder may be assigned by the Licensee, in whole or in part, or by operation of law or otherwise, without the prior written notice and written consent of Licensor except as provided for in Sec. 5.05 of the OptiDoc IDM Product and Services Agreement. Any attempt to sub-license, assign or transfer any Software without the prior written notice and written consent of Licensor shall be null and void.

4. **SELECTION AND USE:** Licensee assumes full responsibility for the selection of the Software to achieve intended results and for the installation, use, and results obtained from the Software, including but not limited to providing a suitable system for installation, providing the appropriate environment for operating the Software and loading the Licensee's data.

5. **INSTALLATION, TESTING AND ACCEPTANCE OF SOFTWARE**: Licensee is responsible for compliance with all preparatory actions necessary for successful installation of the Software, including but not limited to the operation of all required hardware and non-licensed software for the proper operation of the Software. In the event, Licensee fails to properly prepare for the installation of the Software, and Licensor is required to provide services to remedy Licensee's lack of preparation, Licensor shall charge to Licensee fees for services performed and expenses related to such services including but not limited to travel, lodging, and other customary expenses. Licensee shall cooperate with Licensor's installation and be responsible for the compliance of its employees with Licensor's activity to install and the software.

Licensor will install the Software at the installation site. Licensee will test the Software following installation to determine if the Software performs in accordance with the then current description for the Software. If the Software

passes such acceptance procedures, Licensee shall promptly notify Licensor of its acceptance of the Software. If the Software does not pass acceptance procedures, Licensee will notify Licensor in writing to the address provided for Licensor hereinabove, of the specific deficiency or non-conforming performance of the Software. Licensee shall provide such written notice within (60) sixty days following installation of the Software. If Licensee fails to notify Licensor of either its acceptance of the Software or of the failure of the Software to pass acceptance within such sixty (60) day period following installation, such failure to provide notice to Licensor will be deemed as Licensee's acceptance of the Software. Upon Licensor's receipt of written notification of failure of the Software to pass the acceptance test, Licensor will use reasonable efforts to correct such deficiencies to the Software so that it conforms to the current description of the Software. Once Licensor has performed services to correct the deficiencies identified by the Licensee in its notice to Licensor, Licensee will have the right to retest the Software to determine if the deficiencies have been corrected and the Software is acceptable. If the Software has been corrected after such retesting, Licensee shall so notify Licensor. If deficiencies have not been corrected after such retesting, Licensee will have the option to either (1) permit Licensor to make further corrections, reserving the right to terminate this Agreement if further corrections do not conform to current Software description, or (2) to terminate this Agreement and make a refund of the Licensee fee paid. Upon such rejection, this Agreement will terminate and neither party shall have any further rights or obligation to the other hereunder, except that the Licensee will return all copies of the Software to Licensor, Licensor will refund any payments made by Licensee to Licensor under this Agreement and the rights and obligations under the paragraphs entitled "Confidentiality" shall survive such termination.

6.  **TRAINING:** Licensee agrees to designate and make reasonably available to Licensor an employee familiar with Licensee's hardware and applications related to the use of Software to be trained in the use of the Software. Such designated employee of Licensee will be the Licensee's key representative who will attend Licensor Software training program. See Schedule C of the OptiDoc IDM Product and Services Agreement for a description and pricing for this training.

7.  **WARRANTY:**
    a)  For a period of sixty (60) days from the date of Licensee's receipt of the Software, Licensor warrants that the Software will substantially conform to published specifications and to the documentation provided with it when used as specified in such documentation; and the media on which the Software is distributed are free from defects in materials and in workmanship. Licensor does not warrant that the functions contained in the Software will meet Licensee's requirements or that the operation of the Software will be uninterrupted or error free. Due to the inherent complexity of computer software, Licensee is advised to verify Licensee's work. Provided that within the 60-day period, referred to above, if Licensee returns the Software with a copy of Licensee's receipt and all agreements and a written statement specifying in reasonable detail the nature of the claimed non-conformance, Licensor will at its discretion either (a) correct the non-conformance of the Software; or (b) replace the defective media and/or documentation; or (c) refund the license fee.
    b)  LICENSOR DISCLAIMS ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM A COURSE OF DEALING OR USAGE OF TRADE. IN NO EVENT WILL LICENSOR BE LIABLE FOR ANY OTHER DAMAGES WHATSOEVER INCLUDING BUT NOT LIMITED TO, DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OR OTHER PECUNIARY LOSS ARISING OUT OF USE OR INABILITY TO USE THE SOFTWARE, EVEN IF LICENSOR HAS BEEN ADVISED OF THE POSSIBILITIES OF SUCH DAMAGES.
    c)  Licensor is not responsible for any costs including, without limitation, loss of business profits, business interruption, and loss of business information, the cost of recovering such information or the cost of substitute Software. No oral or written information given by Licensor or employees shall create a warranty. In no case shall any direct or indirect suppliers of Licensor bear any liability for any reason whatsoever and in no case shall Licensor's liability exceed the amount of the license fee actually paid by Licensee. No modification or addition to this warranty is authorized unless it is set forth in writing, references this Software License Agreement, and is signed on behalf of Licensor by an authorized official.

8.  **MAINTENANCE:** This Agreement does not express or entitle Licensee to any maintenance to the Software except as provided for in the "Limited Warranty" section of this Agreement. Following the expiration of the limited warranty period for the Software granted herein, Licensee might purchase additional maintenance services by entering into an Annual Software Maintenance Agreement. If the Software is not covered under either the original Limited Warranty or under an Annual Software Maintenance Agreement, Licensee can receive maintenance services by complying with Licensor's then current terms and conditions for technical support on a "per event" basis. For any such services rendered, Licensee will be invoiced per Licensor's current price list for maintenance.

9.  **TERMS AND PAYMENT:** Upon placing an order for the Software, Licensee shall pay to ATS all amounts owing under this agreement including License(s) and Software Maintenance Fees.

10. **TERMINATION**: Licensor may terminate this Agreement immediately and any license(s) to use the Software will automatically terminate without notice if Licensee fails to comply with any provisions of this Agreement. Upon termination Licensee shall return all copies of the Software to Licensor and certify in writing to Licensor that Licensee has done so. All disclaimers of warranties and limitation of liability set forth in this Agreement shall survive any termination of this Agreement.

11. **SEVERABILITY**: In the event that a court of competent jurisdiction determines that any portion of this Agreement is unenforceable, said unenforceability shall not affect any other provisions of this Agreement.

12. **NOTICE.** All notices, requests, demands or other communications required to be given pursuant to the Agreement shall be in writing and shall be deemed to have been given, if sent by U.S. mail, registered or certified mail, return receipt requested, postage prepaid, addressed to the parties at their place of business or to such other addresses as the parties direct in writing.

13. **GOVERNING LAW AND JURISDICTION**: This Agreement shall be governed, interpreted, and enforced by the laws of the State of Georgia. Any legal action brought involving the Software License(s) granted herein, shall be brought only in the courts of the State of Georgia, in the County of Fulton, or in the federal courts located in such state (and county). Both parties to this Software License Agreement submit to venue and jurisdiction in these courts. In the event that an action or claim arises outside of the exclusive jurisdiction specified herein which names Advanced Technology Services, Inc. as a party, Licensor and Licensee specifically agree to initiate, consent to and/or cooperate with all efforts to remove the matter to the exclusive jurisdiction named herein, or otherwise take all reasonable actions to achieve the objectives of this provision.

14. **ENTIRE AGREEMENT**: This Agreement constitutes the entire Agreement and understanding of the parties and supersedes all prior and contemporaneous agreements, understandings, negotiations and proposals, oral or written. This Agreement may be amended or modified only by a subsequent agreement in writing signed by each of the parties and may not be modified by course of conduct.

IN WITNESS WHEREOF, the parties have duly executed this Software License Agreement the date and year first above written.

LICENSEE                                         LICENSOR

TR Music Group                                   Advanced Technology Services, Inc.
1317 N. San Fernando Blvd.                       2000 Powers Ferry Rd.  Suite 535
Burbank, CA 91504                                Marietta, GA. 30067

BY: _____                      BY: _____
Title: _____CFO_____                       Title: ___President /CEO____
Date: ____7-18-20/3_____                        Date: ___07/19/2013_____

**Schedule B**

**OptiDoc®**
# ANNUAL SOFTWARE MAINTENANCE AGREEMENT

This Annual Agreement is made between Advanced Technology Services, Inc. ("Licensor") and Licensee named below. Licensor has licensed the OptiDoc® Integrated Document Management System modules listed in Appendix A ("Software") to the Licensee under a Software License Agreement. Licensor is willing to provide and the Licensee wishes to obtain ongoing Maintenance upon the terms and conditions set forth herein. In consideration for the foregoing promises, covenants, and agreements contained herein, the parties hereto agree as follows:

1. **MAINTENANCE:** Licensor shall provide ongoing revisions and updates to the Software designed or developed by Licensor and released to its other customers as well as updates to on line help when revisions and updates have been implemented in the Software during the Annual Software Maintenance Agreement Period. This Agreement does not pertain to any hardware or third party software regardless of where said hardware or software was obtained. Services performed by Licensor shall be rendered in accordance with its customary business practices as it implements from time-to-time.

2. **FEES, PAYMENTS, TAXES & CURRENCY:** In consideration of Licensor's agreement to provide the services hereunder, Licensee shall pay the "Maintenance Fees" as set forth in Licensors then current retail price list. Licensee shall pay any taxes (other than income or franchise taxes of Licensor) resulting from this Agreement or activities hereunder including without limitations, all sales and use tax. The Maintenance Fee and any other charges arising under this agreement shall be made in U.S. Dollars.

3. **RENEWAL OF AGREEMENT:** This Agreement shall be subject to annual renewal at the option of the Licensor and upon acceptance by Licensee. Licensor shall within sixty (60) days prior to each anniversary date of the Annual Renewal Date, if it desires to renew its agreement, invoice Licensee for its then current annual maintenance fee for the Software and Licensee shall, if it desires such renewal, indicate its acceptance through payment of the amount set forth on said invoice by the commencement of the renewal period

4. **ERROR CORRECTION, ENHANCEMENTS, & OPERATION:** In order to maintain the integrity and proper operation of the Software, Licensee agrees to implement, in the manner instructed by Licensor, all error corrections, enhancements, or improvements provided to the Licensee by Licensor within reasonable limits of cost and effort. Licensees failure to do so shall relieve Licensor of any responsibility or liability whatsoever for any failure or malfunction of the system as modified by a subsequent correction or improvement, but in no such event shall Licensee be relieved of the responsibility for the payment of fees and charges otherwise properly invoiced during the term hereof. If requested by Licensor, Licensee agrees to provide written documentation of problems or errors to substantiate problems and to assist Licensor in the detection and correction of said malfunctions.

5. **OPERATION:** Licensee also acknowledges and agrees that it is solely responsible for the operation, supervision, management, and control of the Software, including but not limited to providing training for its personnel, instituting appropriate security procedures, and implementing reasonable procedures to examine and verify all output before use. Furthermore, the Licensee is solely responsible for the data and the database and is responsible for maintaining suitable backups of the database to prevent data loss in the event of any hardware or software malfunction. Licensor shall have no responsibility or liability for data loss regardless of the reasons for said loss. Licensor shall have no responsibility or liability for Licensees selection or use of the Software or any associated equipment.

6. **SOFTWARE ACCESS:** Licensee shall provide Internet access for maintenance support.

7. **MISCELLANEOUS:** Neither party shall be held liable for delay in performance herein due to causes beyond its control, including but not limited to acts of God, fires, strikes, delinquencies of suppliers, acts of war or intervention by any governmental authority, and each party shall take steps to minimize such delay. No waiver of any breach of any provision of this agreement shall constitute a waiver of any prior, concurrent or subsequent breach of the same or of any other provisions hereof and no waiver shall be effective unless made in writing and signed by an authorized representative of the party to be charged herewith. In the event that any action or proceeding is brought in connection with this agreement the prevailing party therein shall be entitled to recover its costs and reasonable attorney's fees.

8. **EFFECTIVE DATE:** This entire agreement shall become effective on the date accepted and executed by an authorized representative of Licensor.

9. **SEVERABILITY:** In the event that a court of competent jurisdiction determines that any portion of this Agreement is unenforceable, said unenforceability shall not affect any other provisions of this Agreement.

10. **NOTICE.** All notices, requests, demands or other communications required to be given pursuant to the Agreement shall be in writing and shall be deemed to have been given on the date of deposit in the mail, if sent by U.S. mail, registered or certified mail, return receipt requested, postage prepaid, or otherwise upon receipt by the addressee, in any case addressed to the parties at their places of business or to such other addresses as the parties direct in writing.

11. **GOVERNING LAW:** This Agreement shall be governed, interpreted, and enforced by the laws of the State of Georgia.

12. **ENTIRE AGREEMENT:** The parties hereto acknowledge that each has read this agreement, understands it, and agrees to be bound by its terms.

This Agreement constitutes the complete and exclusive written expression of the terms of the agreement between the parties and supersedes all prior or contemporaneous proposals, oral or written, understandings, representations, conditions, warranties, covenants, and all other communications between the parties relating to the subject matter hereof. The parties further agree that this agreement may not be explained or supplemented by a prior or existing course of dealings between the parties pursuant to the license agreement, this maintenance agreement or otherwise.

This Maintenance Agreement and all its provisions are accepted by:

("Licensee")

TR Music Group
1317 San Fernando Blvd.
Burbank, CA 91504

By: _____

Title: CFO

Date: 7-18-2013

("Licensor")

Advanced Technology Services, Inc.

2000 Powers Ferry Rd. SE Suite 535
Marietta, Georgia 30067

By: Maureen Mitchell

Title: President /CEO

Date: 07/18/2013

Advanced Technology Services, Inc. (the "Licensor") agrees to provide to (the "Licensee") OptiDoc Software technical Support services as described herein.

**Term:** This technical support agreement is for a one-year term and shall automatically renew unless either party notifies the other of their intent to cancel in writing 60 days prior to the end of a term. Licensor will invoice for the renewal term prior to the expiration of any term. No renewal shall be effective until the Support Fee is prepaid for the renewal term. Licensor reserves the right to change the prepaid fee and hourly rates at the end of any term.

**Fees:** Licensor agrees to provide Customer unlimited hours of telephone support involving Licensee's OptiDoc software as described in "Exhibit A." This Agreement is for a 1-year period and time not used is non-refundable.

**Supported Products:** Listed on Exhibit A. Customer may request Support for non-listed products or additional products during the term of this Agreement. Licensor may, at its option, provide support for such products at its standard rates.

**Technical Support:** Licensor shall provide support for the Products so long as hourly charges for support do not exceed the prepaid Support Fees. Customer is guaranteed 8-hour response time to calls received during regular business hours.

**Regular Business Hours:** Support calls are taken Monday through Friday from 9:00 A.M. to 5:30 P.M. Eastern Standard Time. Support services requested for after hours and Saturdays are billed at $328.13 per hour and $437.50 per hour for Sundays and Holidays.

**On-Site Support:** Licensee may provide on-site support at Licensee's request. All on-site support will include charges for technician's labor billed @ $219.75 per hour or $1,750.00 per 8 hour day plus travel time, transportation charges, parking expenses, and meals and lodging as incurred by Licensee.

**Remote Support:** Licensor may provide remote support by WebEx if Customer has necessary equipment and grants Licensee access to Customer's system.

**Assignment:** This Agreement is not transferable without the written consent of Licensor.

**Disclaimer of Warranty:** Licensee acknowledges that Licensor will use its best efforts to provide technical support by phone or on-site under this Agreement. However, Licensor does not warrant or guarantee that it can resolve each and every problem and Licensor makes no warranties either express or implied under this Agreement. PROVDER SHALL NOT BE LIABLE TO USER FOR ANY LOSSES OR DAMAGES, DIRECT, INDIRECT OR CONSEQUENTIAL, RESULTING FROM OR RELATED TO THE SERVICES PERFORMED BY LICENSEE THEREUNDER.

ACCEPTED BY:

("Licensee")

TR Music Group
1317 N. San Fernando Blvd.
Burbank, CA 91504

By: _Laura Riley_

Title: _CFO_

Date: _7-18-2013_


("Licensor")

Advanced Technology Services, Inc.
2000 Powers Ferry Rd, Suite 535
Marietta, GA. 30067

By: _Maureen Michell_

Title: _President_

Date: _7/19/2013_

5760201179

# Invoice



**Advanced Technology Services, Inc.**
P.O. BOX 731107
Dallas, TX 75373-1107
Phone 678-419-0070
Fax 678-419-0077

| Bill To | Ship To |
|---|---|
| TR MUSIC GROUP<br>1317 N. SAN FERNANDO BLVD.<br>BURBANK, CA 91504 | TR MUSIC GROUP<br>ATTN: LAURA RILEY<br>1317 N. SAN FERNANDO BLVD.<br>BURBANK, CA  91504 |

| Invoice Date | Invoice No. | Your P.O. No. | SLSPN | Order Date | Ship Date | Terms |
|---|---|---|---|---|---|---|
| 07/19/13 | 00014595 | | MM | 07/19/13 | | NET 60 DAYS |

| Item / Description / Serial | Quanities | Unit | Unit Price | Amount |
|---|---|---|---|---|
| OPTIDOC SOFTWARE: | | | | |
| | | | | |
| OPTIDOC (350) USER WEBIT SYSTEM | 350 | 350 | $750.00 | $262,500.0 |
| (2) BANK LOCKBOX GATEWAY SYSTEMS | 2 | 2 | $29.995.00 | $59.990.00 |
| (2) SERVER CONNECTIONS W/ADMIN MODULES | 2 | 2 | $1,995.00 | $3,990.00 |

| Non-Taxable | Taxable | Sales Tax | Freight | Misc. | INVOICE TOTAL |
|---|---|---|---|---|---|
| $326480.00 | 0.00 | 0.00 | 0.00 | 0.00 | $326,480.00 |

Tue Feb 18 2014 08:33:02 PM
broche

# THE RECEIVABLES™ EXCHANGE

## Advanced Technology Services, Inc. - Auction #27251 - Sold

### Auction Details

| | | | | |
|---|---|---|---|---|
| Face Value: | $326,480.00 | Minimum Advance Amount: | $277,508.00 | (85.000%) |
| Advance Amount: | $277,508.00 | Max 30-day Discount Fee: | $5,713.40 | (1.750%) |
| Discount Fee: | $5,713.40 | Buyout Advance Amount: | $293,832.00 | (90.000%) |
| Buyout? | No | Buyout 30-day Discount Fee: | $5,223.68 | (1.600%) |
| | | Insurance Status: | Ineligible | |
| Basket Type: | Current | | | |
| Auction Ended: | Mon Aug 5 2013 03:00:00 PM | | | |
| Repurchase Date: | Mon Dec 16 2013 | | | |
| Last Invoice Due Date: | Tue Sep 17 2013 | | | |

### Closing Values

#### Seller Closing Values

*Advanced Technology Services, Inc.*

| | |
|---|---|
| Advance Amount: | $277,508.00 |
| Transaction Closing Fee (0.350%): | ($1,142.68) |
| Posting Fee: | ($10.00) |
| Net Amount: | $276,355.32 |

#### Buyer Closing Values

*Brooklawn Capital*

| | |
|---|---|
| Advance Amount: | $219,231.32 |
| Transaction Closing Fee (0.100%): | $257.92 |
| Net Amount: | $219,489.24 |

*SBS OPPORTUNITIES FUND SICAV PLC*

| | |
|---|---|
| Advance Amount: | $58,276.68 |
| Transaction Closing Fee (0.100%): | $68.56 |
| Net Amount: | $58,345.24 |

Confidential
Copyright 2014 The Receivables Exchange, LLC. All rights reserved.

Tue Feb 18 2014 08:33:02 PM
broche

# THE RECEIVABLES™ EXCHANGE

## Invoice Basket

| Face Value | Account Debtor | Invoice # | Invoice Date | Invoice Due Date | Terms | Discounts Offered | Verification |
|---|---|---|---|---|---|---|---|
| $326,480.00 | TRMusicGroup | 00014595 | 07/19/2013 | 09/17/2013 | 60 | No | Accepted |

## Bid Book

| Time | Allocation % | Notional % | Advance % | Discount % | NPV % | Buyer | |
|---|---|---|---|---|---|---|---|
| 08/05/2013 14:41:10 | 79 | 79 | 85.000 | 1.750 | 98.215 | Brooklawn Capital | |
| 08/05/2013 14:53:21 | 21 | 21 | 85.000 | 1.750 | 98.215 | SBS OPPORTUNITIES FUND SICAV PLC | |

Confidential
Copyright 2014 The Receivables Exchange, LLC. All rights reserved.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| THE RECEIVABLES EXHANGE, LLC, a Louisiana limited liability company | TRMUSICGROUP, Nevada corporation; TEDDY RILEY, an individual; LAURA RILEY, an individual; STORM DUBOIS, an individual; and DOES 1 through 10, inclusive |

| (b) County of Residence of First Listed Plaintiff   New York, New York | County of Residence of First Listed Defendant   Los Angeles |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| Matthew C. Mickelson, Law Offices of Matthew C. Mickelson, 16055 Ventura Blvd., Ste. 1230, Encino, CA 91436, 818-382-3360 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☒ MONEY DEMANDED IN COMPLAINT: $ 326,480

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

State causes of action invoked in diversity case (28 USC 1332)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 195 Contract Product Liability | ☒ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | ☐ 196 Franchise | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | **REAL PROPERTY** | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | ☐ 230 Rent Lease & Ejectment | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

| FOR OFFICE USE ONLY: | Case Number: | CV14-09219 |
|---|---|---|

CV-71 (10/14)                    CIVIL COVER SHEET                    Page 1 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? <br> ☐ Yes  ☒ No <br> If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? <br> ☐ Yes  ☒ No <br><br> If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? <br> *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question B.2. |
| | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br> *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? <br> ☐ Yes  ☒ No <br><br> If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? <br> *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Continue to Question C.2. |
| | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) <br> *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1. Is there at least one answer in Column A?** <br> ☐ Yes  ☒ No <br><br> If "yes," your case will initially be assigned to the SOUTHERN DIVISION. <br> Enter "Southern" in response to Question E, below, and continue from there. <br> If "no," go to question D2 to the right. → | **D.2. Is there at least one answer in Column B?** <br> ☐ Yes  ☒ No <br><br> If "yes," your case will initially be assigned to the EASTERN DIVISION. <br> Enter "Eastern" in response to Question E, below. <br> If "no," your case will be assigned to the WESTERN DIVISION. <br> Enter "Western" in response to Question E, below. ↓ |
|---|---|

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | WESTERN |

| QUESTION F: Northern Counties? | | |
|---|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes | ☒ No |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**          ☒ NO          ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**
☒ NO          ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

---

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____     DATE: November 19, 2014

---

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

---